UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        No. 4:09 CR 411 CEJ
                                    )                      DDN
WILLIAM A. FALLER,                  )
BRANDI M. HUTCHINGS,                )
                                    )
            Defendants.             )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Hearings were held on August 14, and 27, and September 30, 2009. The parties have filed post-hearing memoranda.

Pending are the motions of the parties regarding whether certain evidence should be suppressed, Docs. 17, 18, 20, 21, 28, 31, and 32. From the evidence adduced at the hearings, the court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**
September 25, 2008

1. In September 2007, Missouri Highway Patrol Trooper Donald Crump,[1] other members of the Highway Patrol, and federal Drug Enforcement Administration personnel investigated information provided by then confidential informant Danny Mannes about the actual use of two pounds of pharmaceutical (high) grade pseudoephedrine[2] to manufacture

_____

[1]At that time, Trooper Crump was a member of the Mineral Area federal Drug Task Force, which was responsible for an area that included Jefferson County.

[2]Later in the investigation, the officers traced this high grade purity pseudoephedrine to KV Pharmaceutical Company in St. Louis.

methamphetamine.[3]  Crump had never before seen this large an amount of high quality pseudoephedrine and law enforcement officers believed that more of this high quality pseudoephedrine remained available to be used to manufacture methamphetamine.   This belief fueled an ongoing investigation to locate the source of this high-grade pseudoephedrine.

2.   During September 2008, Trooper Crump investigated reports that a 55-gallon drum of pharmaceutical grade pseudoephedrine was being used in the illegal manufacture of methamphetamine.

3.   By September 2008, Trooper Crump had been investigating illegal drugs and narcotics for nine years.   He had been trained extensively regarding, and had investigated, methamphetamine production[4] and trafficking, and the cleaning up of methamphetamine labs where this controlled substance is manufactured.[5]  The officer's training and experience included identification of methamphetamine precursors and laboratory equipment necessary to its manufacture, and the precautions necessary for the safety of the public and law enforcement officers when investigating methamphetamine labs.   The safety risks involved with methamphetamine labs were known by him to include unsafe exposure to the chemicals necessary for manufacturing methamphetamine due to their high volatility, flammability, and poisonous nature.   The safety risks also involved dealing with individuals who, after consuming methamphetamine, become unsafe and unstable to deal with due to paranoia.   Usually, several people are involved in the manufacture ("cooking") of methamphetamine, including the "cooker" and others used in acquiring pseudoephedrine,[6] the usual key ingredient in methamphetamine.   In his

---

[3]Neither defendant Faller nor defendant Hutchings were involved in this manufacturing activity.

[4]Trooper Crump had investigated approximately 1000 methamphetamine labs by September 2008.

[5]Cleaning up methamphetamine labs was known by Trooper Crump to involve dismantling them and disposing of the hazardous materials used in, and the by-products of, the manufacture of methamphetamine.

[6]In order to restrict the amount of pseudoephedrine that is available to be purchased for the illegal manufacture of
(continued...)

work, Trooper Crump has participated in the execution of several hundred search warrants, arrested over 1,000 people, and worked with several hundred cooperating individuals.

4.     As of September 2008, from his training and experience, Trooper Crump knew that there are at least two methods for manufacturing methamphetamine, each using pseudoephedrine.  One method involves using anhydrous ammonia and lithium.  The second uses red phosphorous and black iodine.  In the first method, the "cooker" (the person manufacturing the methamphetamine) soaks the pseudoephedrine in a solvent such as ether, Coleman fuel, or antifreeze fluid.  Then, the binding agents are filtered from the solution and the remaining solution is distilled until a powder is formed.  This process can be lengthy. The purity of the pseudoephedrine is an important factor in achieving a high level of purity of the methamphetamine product.  Also, Trooper Crump was familiar with the very strong odors produced by the manufacture of and the use of methamphetamine.

5.     During September 2008, while Trooper Crump and other law enforcement personnel continued to investigate the source of the high grade pseudoephedrine, a confidential source (CS) contacted Crump and told him that Christopher Bailey told CS he had a quantity of pure pharmaceutical grade pseudoephedrine.  Crump was told by CS that Bailey[7] said he got the pure material from William Faller who had a 55-gallon drum of the material.  With this information, Crump quickly formed a plan to go to Faller's residence and engage in a "knock and talk" procedure.  By this procedure the police would go to Faller's residence

_____

[6](...continued)
methamphetamine, state and local laws limit the number of products containing this ingredient that can be bought at one time in retail stores.    These laws are sometimes evaded by persons using false identification to buy pseudoephedrine or by persons going to several stores one after the other to buy the material.

[7]Trooper Crump had not known of Christopher Bailey before this time.  The police investigated Bailey's whereabouts in the DeSoto area, but were not able to locate him.

and in a lawful way, although without a warrant, ask for permission to search Faller's residence.[8]

6.    On September 25, 2008, Trooper Crump and approximately seven other law enforcement officers[9] met on a parking lot near DeSoto and planned their knock and talk activity. From there they drove their vehicles to William Faller's residence at 2166 Lake Park Trail[10] in DeSoto, Missouri, arriving around 3:00 p.m.[11] Crump parked his vehicle on the public gravel road. He and other officers entered the property on the north side and walked the short length of the driveway to a carport. The outside of the property was strewn with items, including vehicles. To the left of the carport was a mobile home residence. A recreational vehicle (RV) was parked in front of the mobile home residence. A work truck and an outbuilding shed were located nearby. In the middle of the outdoor area was a burn pile, where discarded materials were burned.

---

[8]A "knock and talk" procedure is used by law enforcement, when, in the opinion of the police, in the then-current circumstances, conducting other investigative techniques, such as surreptitious surveillance and obtaining a search warrant, would be impractical due to the large amount of time necessary to undertake these actions. The police believed that, in response to a lawful entry onto the property by the police, the police might learn from the responses of those on the property, e.g., people might flee, they might cooperate in the investigation, or they might not cooperate.

[9]Some of the officers were from the Mineral Area Drug Task Force. Others, including federal Drug Enforcement Administration Drug Diversion Investigator David Tatamble, were present as part of the DEA Drug Diversion Group. Federal Diversion Investigators participate in such investigations, because their training and investigative experience enable them to quickly identify drug items. The hearing testimony differed over whether the officers included a police canine team. Whether or not a canine team participated in the "knock and talk" operation at Faller's property, or came to the property later, is an irrelevant issue; if a canine police team was present, no evidence was adduced about any activity by the canine team during the investigation.

[10]Lake Park Trail is a gravel road. Faller's residence is in a wooded area.

[11]Trooper Crump had had no contact with William Faller before this date.

7.     After entering the property, officers walked to different outdoor locations on the property.   As soon as he walked onto the property,  Investigator  Tatamble  smelled  the  odor  of  burning methamphetamine which seemed to come from the recreational vehicle. Trooper Crump saw a woman on a gravel path between the carport and the residence.   He  had  never  seen  her  before.    Crump  walked  to  her, explained why the officers were there, asked her who she was, and asked her if she knew where William Faller was.   She identified herself as Brandi Hutchings and said that she did not know where Faller was, that she  had  lived  there  for  six  years,  that  she  and  Faller  had  been fighting, and that she was in the process of moving out.

8.     Officer Crump, who was wearing plain clothes with a badge and a police shirt that bore the word "POLICE", then walked up to the mobile home residence.   Other officers walked down to the RV and outbuildings to try to locate Faller.   One officer stayed with Ms. Hutchings.   When he reached the residence, Crump knocked on the door.   At that time, Faller walked out of the recreational vehicle and was seen by Trooper Shannon  Sitton.    Sitton  called  to  Crump  that  Faller  was  at  the recreational vehicle.   Two officers took Faller by the arms and began walking him toward Trooper Crump who had begun walking toward them. They met halfway  between  the  residence  and  recreational  vehicle,  near  a swing, a trampoline, and the burn pile.

9.     In the burn pile, the officers saw a half of a partially burned Kentucky Fried Chicken bucket inside of which Officer Crump saw two  unburned  empty  pseudoephedrine  boxes.    Other  partially  burned pseudoephedrine boxes were scattered around on the burn pile, but outside the Kentucky Fried Chicken container.   Investigator Tatamble saw anhydrous ammonia tanks on the premises.

10.     When they were standing at the burn pile, Trooper Crump saw that Faller was nervous and that the front pockets of his blue jeans appeared to contain something.   Crump told Faller why the police were there and asked him if would not mind emptying his pockets.   Faller

agreed to do this and emptied his pockets on a flat surface nearby.[12]
Among the items Faller took from his pockets was a black flashlight,
approximately two inches in length and about as wide as a nickle.  Crump
asked Faller whether he could examine the flashlight.  Faller said Crump
could do so.  Crump tried to turn the flashlight on and saw that it did
not light up.  From his police experience, Trooper Crump believed it
likely that something was secreted inside the flashlight.  He then
unscrewed the flashlight and found inside material he believed was
methamphetamine.  The material was off-white, chunky, extremely moist,
and smelled strongly of ether.  The condition of the methamphetamine
indicated to the officer that it was recently manufactured.  Crump then
seized the flashlight as evidence of criminal activity.  With the
information learned by this time in the investigation, Trooper Crump
detained Faller pending further investigation.

11.  Trooper Crump then continued to explain why the police were
there and asked Faller whether he would consent to the officers
searching his property.  Faller appeared to be uncertain about whether
to allow or deny consent to search.[13]  Faller asked for an opportunity
to speak with an attorney.  The officers allowed Faller to use his cell
phone to call his attorney.  Faller made a couple of calls, waited for
the attorney to call back, and then spoke with someone on the phone.
Ultimately, Faller denied consent to the police to search his property.

12.  Also present on the property with Faller and Hutchings were
Randy Bryant[14] and Gary Sutton.  Bryant and Sutton had walked with Faller
and Sitton to meet with Crump.  At this time, Ms. Hutchings was near the
carport with a DEA officer.

---

[12]In his testimony at the hearing, Trooper Crump was unsure whether
Faller emptied his pockets on the nearby trampoline or some other
surface.

[13]At this time, Faller appeared to Trooper Crump to understand what
was going on around him.  Faller's responses to the officer appeared to
be appropriate to the officer's statements.

[14]Bryant was allowed to leave approximately 30 minutes after the
officers arrived at the Faller property.

13.    Because Faller had refused to consent to the police searching his property, Troopers Crump and Sitton drove to the Jefferson County Prosecuting Attorney's office to apply for a search warrant.  The other officers waited on the property with Faller, Hutchings, and Sutton. Bryant had been allowed to leave by this time.

14.    Trooper Crump submitted his application for a search warrant for Faller's property that same day, September 25, 2008.  He signed the application under oath before Associate Circuit Judge Nathan Stewart. The application was countersigned by an assistant prosecuting attorney. Gov. Ex. 1 (Application).

15.    In support of the application for the warrant, Trooper Crump submitted to the circuit court his written sworn affidavit.  In his affidavit, he recounted information learned in the investigation: On September 24, 2008, he was contacted by a reliable[15] Missouri Highway Patrol confidential informant who said he had been in contact with a person named Chris Bailey during the preceding week and saw Bailey possessing an amount of "pharmaceutical grade pseudoephedrine."  The affidavit stated that the informant said that Bailey said that a person named William Faller possessed a 55-gallon drum of pharmaceutical grade pseudoephedrine.  The affidavit stated that on September 25, 2008, the officers drove to Faller's residence at 2166 Lake Park Trail in DeSoto to obtain consent to search Faller's residence.  There with Faller were three other persons, Bryant, Sutton, and Hutchings.  The affidavit described the discovery of recently manufactured methamphetamine inside the black flashlight which had been on Faller's person.  The affidavit also stated that a consensual search of Faller's person revealed a small amount of marijuana.  The affidavit stated that Faller denied consent to search his residence.  The affidavit also stated that Trooper Crump saw on a burn pile on the premises two empty Sudafed brand pseudoephedrine boxes, along with a small piece of rolled up aluminum foil that contained a burned residue.  The affidavit recounted that Crump's training and experience indicated to him that pseudoephedrine is the main ingredient of methamphetamine and that aluminum foil is

---

[15]The affidavit stated that the informant had given reliable information on many occasions over the past two years.

commonly used to "ingest" marijuana. The affidavit described the residence as a single-wide mobile home, including a wooden deck and steps, a detached carport, and "many outbuildings, lean-tos, and vehicle[s] (abandoned and running)." Id. (Affidavit).

16. Based upon the application and the affidavit, Judge Stewart, at 5:25 p.m., signed a search warrant to search for methamphetamine, related paraphernalia, precursors, ether, tubing, muriatic acid, products containing ephedrine, fuel tanks, anhydrous ammonia tanks, glassware, lithium batteries, salt, filters, scales, records, documents, receipts, proceeds, and documents relating to the premises. The property was described in the warrant as "a single-wide mobile home with white, vinyl siding and a white wooden deck attached to the front of the residence. It has several derelict and running automobiles parked on the property, along several outbuildings and lean-tos." Id. (Search Warrant).

17. After the warrant was signed at 5:25 p.m., Trooper Crump returned to Faller's property. While waiting for Crump to return with a warrant, Faller, Hutchings, and Sutton were detained on the property. They were allowed to walk around outside. Also, while waiting for the search warrant, no law enforcement officer went inside the residence.

18. Because Missouri law does not permit Missouri Highway Patrol officers to execute search warrants without contacting the Sheriff's Office of the subject county, the Jefferson County Sheriff's Office was notified and Jefferson County Drug Task Force officers came to the Faller residence to assist in the execution of the search warrant. DEA Drug Diversion Investigator Tatamble had remained on the property to aid in executing the search warrant.

19. When he returned to the Faller property, Trooper Crump gave Faller a copy of the search warrant which he appeared to read. In the execution of the warrant, officers went to different locations on Faller's property. When an officer found an item to be seized, he notified Trooper Crump and a police photographer went to the location to photograph the item to be seized. The areas searched were the open area which included the burn pile, the mobile home residence, the RV, the shed, a red Firebird automobile, and the yellow truck. The officers

entered the residence through the unlocked door, the RV through an unlocked door, the shed through an unlocked door, and the yellow truck through an already open door.  Many items were seized from these areas. Gov. Ex. 1 (Crime Scene/Search Warrant Inventory).

20.  Among the items seized in the execution of the search warrant were the following:

a.   Fourteen letter-size pages of handwritten notes were found in the residence and seized.  All but one were seized from a counter in the kitchen; the remaining page was seized from next to a computer in another room.  Trooper Crump examined the notes and determined that they were written communications to and from Faller and Hutchings.  One of the notes stated that the other person had "dope" at a storage shed.  Gov. Ex. 3.

b.   A receipt was found in the name of B. Hutchings for the rental of a commercial storage unit, No. 85D, at Budget Storage for the period June 31 (sic) to July 31. Gov. Ex. 2.  The receipt was found in the computer room of the mobile home.  Gov. Ex. 1.

c.   A change purse was seized in which were found baggies containing white powder,[16] a Sears credit card belonging to Hutchings, and a green pill.[17]

d.   From the yellow truck (which was inoperable and was used as a shed) were seized two cans of starter fluid, boxes of pseudoephedrine, a propane fuel tank, a digital scale (recognized by the police as of the type used to measure narcotics for sale), and baggies containing white powder.

e.   From a red Firebird automobile was seized a small purse with a baggie of white powder.

f.   Cell phones were seized from the persons of Faller and Sutton.

g.   An 80-pound safe, approximately 2 feet on each side, was found. An officer asked Faller whether he would open it and Faller said he did not know the combination.  An officer opened the safe with a sledge hammer.  Nothing of investigative value was found inside

---

[16]Later, the white powder tested positive for methamphetamine.

[17]Also found in the change purse was money which was not seized.

it.  Faller was asked about the safe and he told the officers that he did not know anything about it, other than he had gotten it from his mother before she died.

h.  Between 150 to 300 pills were seized from the entire premises, some from the mobile home residence and some from the recreational vehicle.

21.  The officers searched for approximately two hours.  During the search, Faller was kept outside by the trampoline and Hutchings remained near the carport.  Following their usual procedure, the officers did not allow either of them to return inside the residence during the search.

22.  During the search, Trooper Sitton asked Faller whether he had any drug money buried in polyvinylchloride (PVC) tubes in the ground. At first, Faller said he did not have anything buried in the ground. Later, he said he had one tube buried in the ground up on a nearby hillside.  Trooper Sitton asked Faller to show him this area.  Faller took Sitton and Sgt. Stewart to the location, which was several hundred feet down a dark trail which the officers illuminated with flashlights. The three walked up on a hill in the woods near an old trailer.  When the officers did not find anything, Faller moved a stump he had previously cut and disclosed a PVC tube buried in the ground.  The tube was empty and 15 minutes later the group returned to the main area of the property.

23.  At the end of the search, Trooper Crump went to Brandi Hutchings and, regarding the receipt and the storage unit, asked her whether there was anything there.  Hutchings said there was nothing illegal there.  Crump then asked her whether she would consent to a search of the storage unit.  She said that the police could search it and that she would go there with the police.[18]  When asked, she told the

----

[18]When Hutchings told the officers they could search the storage unit, she had not been advised of her <u>Miranda</u> rights.  Defendant Hutchings testified at the hearing that she did not give her consent to the officers to search the storage unit.  The undersigned credits the testimony of the officers that Hutchings cooperated with them in the investigation, because that is consistent with their and her testimony that, when the officers arrived, she was in the process of moving away
(continued...)

officers that the key to the storage unit was in her purse. An officer got her purse and Hutchings took the key from it and gave it to an officer. The police also asked her whether she would sit down and talk with them about the investigation. She agreed to cooperate and to provide information. However, she also told the officers that she was afraid of William Faller and she did not want him to know that she was talking to the police.[19]

24. At that time the officers formally arrested William Faller and took him to the Jefferson County Jail. Sutton, who had been present throughout the police search, received a summons by a trooper for possession of a small amount of marijuana and was released.

25. At approximately 8:15 p.m., the police completed the search of Faller's property and drove to the Budget Storage facility. Brandi Hutchings was brought there voluntarily in a Highway Patrol car.[20] After they arrived, an officer opened the storage unit's door with the key earlier provided by Hutchings. The interior of the unit was approximately 9 feet wide and 10 to 15 feet deep. The officers illuminated the area of the storage unit with several flashlights; the interior of the storage unit had a light. The storage unit was full of disorganized personal items, including baskets and boxes of clothes and toys.

26. Task Force Officer Thompson directed the search of the storage unit. The officers looked for pseudoephedrine tablets and pharmaceutical grade pseudoephedrine powder. Officers carried items from inside the storage unit and laid them on the ground outside where some were photographed. The police seized approximately 6 items,

---

[18](...continued)
from Faller. Further, in her hearing testimony, Hutchings testified she signed the <u>Miranda</u> warnings form at the county jail and she never refused to answer the officers' questions in the jail interview.

[19]At the suppression hearing, Hutchings testified that she was not afraid of Faller, but that she was afraid of going to jail. The undersigned credits the officers' testimony to the contrary, because at that time she was in the process of moving away from Faller.

[20]By this time Hutchings still had not been formerly arrested or handcuffed.

including a quantity of white powder and 40 to 50 pills.[21]  During the search of the storage unit, Hutchings was inside the police car and was able to watch the search.[22]  During the search, Hutchings was asked questions which she answered.  Hutchings never told the officers to stop searching.  They stopped searching after approximately two hours.

27.  Next, Hutchings was taken to the Jefferson County Jail for an interview.  Before they arrived, Investigator Tatamble told Hutchings that she needed "to get out in front of this right now."  When asked whether she would cooperate, Hutchings said Yes.  Because she was afraid that Faller would hear her or learn that she was cooperating with the police, measures were taken to get her into a jail interview room without Faller learning that she was there and cooperating with the police.

28.  DEA Investigator Tatamble interviewed Hutchings in an interview room.  At the beginning of the interview, he filled out the top part of an Advice of Rights form, handwriting her name, her date of birth (November 28, 1978)(she was then 29 years of age), her social security number, the location of the interview (Jefferson County Sheriff's Office), the date (September 25, 2008), and the time (11:05 p.m.).  Hutchings read the form, which set forth her constitutional rights to remain silent and to counsel, signed her initials by each of the enumerated rights and signed the form on September 25, 2008, at 11:07 p.m., expressly acknowledging and waiving her rights.  Before she signed the form, Tatamble asked her whether she understood the form.  She answered Yes.  After she signed, he asked her whether or not she had an attorney, to which she said No.

---

[21]Four bottles of pills, later tested by the Missouri Highway Patrol Crime Lab, tested positive for pseudoephedrine.  Seized from a purse was a prescription bottle with a mixture of Hydrocodone pills and Xanax pills.  When this bottle was found, Hutchings was brought from the police car and shown the bottle of pills.  She said she had them from when she had been under doctor's care.

[22]During the suppression hearing, Hutchings testified she could not see the officers searching the storage unit.  The undersigned credits the government's evidence to the contrary.

29.  Next, Tatamble interviewed Hutchings.  In response to the officer's questions, Hutchings made oral statements.  During this time, Tatamble and three or four officers were in the interview room with Hutchings.  At no time did any officer display his weapon.  At no time was Hutchings handcuffed during the interview.  At the end of the interview, Tatamble asked whether she would give a written statement.  Hutchings declined to do so.

30.  At no time on September 25, 2008, did any officer draw a firearm on Faller or Hutchings.  No threat was made to get either of them to cooperate with the police.  At no time on this date was Hutchings handcuffed.  When Hutchings was asked questions, she appeared to understand the questions that were asked her.

<u>June 23, 2009</u>

31.  In June 2009, the federal grand jury issued the indictment in this case against William Faller and Brandi Hutchings.  Federal arrest warrants were issued on the indictment.  About 10:00 a.m. on June 23, 2009, officers including Highway Patrol Troopers Sitton and Stewart, and DEA Agents Ralph Stone and Frank Magel, went to the Faller residence at 2166 Lake Park Trail in DeSoto to execute the warrant and arrest Faller. The officers knocked on the door of the residence.  Faller came to the door, stood in the threshold, and then walked onto the front deck.  At that time, Sgt. Stewart told Faller about the indictment and the arrest warrant for him.  Faller said nothing and a uniformed Highway Patrol Trooper handcuffed him.

32.  Next, on the deck of the residence, a trooper searched Faller and found a glass vial in his pocket.  The trooper handed it to Trooper Sitton.  Sitton looked at the contents of the vial and believed it was methamphetamine.  Sitton took the vial to his patrol car and field tested the contents which tested positive for methamphetamine.

33.  Before Agents Moore and Magel placed Faller in their vehicle, Moore advised Faller of his constitutional rights to remain silent and to counsel, by reading them to him from a card.  When he finished reading, Faller said he understood his rights.  Agent Moore asked Faller whether he had an attorney.  Faller said he had an attorney on another

matter.  Moore asked him who the attorney was and what his phone number was.  Faller provided it and Moore tried to phone him.  However, Agent Moore was unable to contact the attorney on that day.

34.   Trooper Sitton asked Faller whether he had any other drugs in the house and Faller said No.  Sgt. Reed asked Faller whether he would consent to a search of the property.  Faller said, "I don't give a fuck what you do."  The officers took that statement as Faller consenting to them searching his property, inside and outside his residence.

35.   Moore said to Faller that the reason Faller was advised of his rights was so that Faller could tell them whether he had a body buried on his property.  The agent made this statement in mild humor with a slight smile; Faller did not respond to this statement.

36.   The officers then searched Faller's mobile home residence.  Inside, they found Brandi Hutchings and a juvenile.  Several items, which appeared to be related to the production of methamphetamine, were seized.  An inventory of the items seized was made, Government Exhibit 5.  There were two bedrooms in the residence, one containing a man's clothing; this room was searched.  The other bedroom contained a woman's clothing; nothing was seized from this room.

37.   Containers containing Coleman fuel, acetone, and ether, were found in a truck on the property.  Because Missouri state authorities consider these materials hazardous, the officers disposed of them.

38.   The agents then put Faller in the back seat of their vehicle and they drove back to the DEA office in St. Louis, a trip of more than an hour.  During the drive, as a comment to the earlier statement by Agent Moore about enquiring about bodies buried on Faller's property, without being asked any question, Faller said that he was sick and tired of people asking him about things buried on his property, like money.  In response, Agent Magel asked Faller what he was talking about, because the agent had not heard any of these allegations.  Faller said he had won $100,000 at a casino and people thought he had buried it.  Agent Magel asked what he meant.  Faller said he had won the money, but he had not paid taxes on it.  He said the government was after him for the taxes, but he had already spent it on vehicles, including a motorcycle.

39.    At the time of his arrest on June 23, 2009, Faller appeared to be competent; he did not appear to be under the influence of drugs. His demeanor was indifferent; he did not seem to care about the officers' investigation.

## DISCUSSION

The undersigned has considered whether the physical evidence and the defendants' statements should be suppressed. At the suppression hearing, defendant Hutchings withdrew any motion to suppress her statements on the ground that she made no incriminating statement. The undersigned has nevertheless considered whether any of her statements should be suppressed, in the event such an issue would arise at trial.

### A.   Fourth Amendment Issues

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. The goal of the Fourth Amendment is to ensure that a search will be carefully tailored to its justifications, and will not become a wide-ranging exploratory search. Maryland v. Garrison, 480 U.S. 79, 84 (1987).

### Events of September 25, 2008

**1.    Entry onto the Property**

When police enter private property, but restrict their movements to areas generally accessible to the public, their actions do not rise to the level of a "search" for Fourth Amendment purposes. United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008), cert. denied, 129 S. Ct. 1658 (Mar. 23, 2009). Even without probable cause, police may knock on a door. Id. This "knock and talk" procedure does not "contravene the Fourth Amendment, even absent reasonable suspicion." Id. (quoting United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006)).

However, if police assert their authority, refuse to leave, or otherwise indicate that the suspect cannot refuse to open the door, the encounter may soon implicate the Fourth Amendment.  Id.

During their investigation, the police received information that Faller had a very large amount of high-quality pharmaceutical grade pseudoephedrine at his residence.  Eager to investigate this information, Trooper Crump decided to engage in a "knock and talk" procedure.  On the day in question, Crump and the other officers drove to Faller's residence, parked on a public road, and walked the length of the driveway to a carport.  As the officers split up to try and locate Faller, they restricted their movements to the different outdoor locations on the property.  In fact, Crump was knocking on Faller's residence when Trooper Sitton saw Faller exiting the RV.  Looking to Spotted Elk, the officers' presence and movements on Faller's property conformed to the "knock and talk" procedure, and therefore, did not violate the Fourth Amendment.  See id. ("No Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors - such as driveways, walkways, or similar passageways.").

**2.    Search of the Flashlight**

Voluntary consent provides a notable exception to the warrant and probable cause requirements of the Fourth Amendment.  United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005).  Even without a warrant, a search is legal if the subject of the search gives his consent, and that consent is knowing and voluntary.  Id.  The government bears the burden of proving that a defendant's consent to a search was voluntary by a preponderance of the evidence.  United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006).  The question of voluntariness requires a review of all the facts, including the characteristics of the accused and the details of the interrogation, and examines whether consent was given without any form of police coercion.  Sanders, 424 F.3d at 773; United States v. Fleck, 413 F.3d 883, 891-92 (8th Cir. 2005).

Officer Crump approached Faller and asked him if he would mind emptying his pockets.  When Faller agreed, removing a flashlight, Crump

then asked if he could examine the flashlight.  Faller agreed to this
as well, and a search of the flashlight produced methamphetamine.

At the time of the consent, Faller was standing between his
residence and RV, with at least three officers around him.  Officer
Crump was in plain clothes, and there is no evidence the officers made
any threats or show of force.  The officers had only recently arrived
at the residence, and had not placed Faller in custody.  In addition,
there is no evidence Faller was impaired at the time; he understood what
was going on, and his responses to the officer's statements were
appropriate.  He also seemed fully aware of his rights; a few minutes
after this encounter, Faller asked to call his attorney, after which he
refused to consent to a search of his property.  See Sanders, 424 F.3d
at 773 (listing factors to consider when determining whether a suspect's
consent was free and voluntary).  Looking to the totality of
circumstances, Faller's consent to a search of the flashlight was
voluntary.  The flashlight with the white powder should not be
suppressed.

### 3.    Search Warrant Application

The issue before this court when reviewing the validity of the
issuance of a search warrant is whether the supporting materials gave
the issuing judge a substantial basis for concluding that probable cause
existed for the issuance of the warrant.  United States v. Stevens, 439
F.3d 983, 987 (8th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213,
238-39 (1983)).

For a warrant to issue properly under the Fourth Amendment, the
warrant must be supported by probable cause.  Illinois v. Gates, 462
U.S. at 238-39.  Probable cause exists, if under the totality of the
circumstances, "there is a fair probability that contraband or evidence
of a crime will be found in a particular place."  Id.  In deciding
whether there is probable cause to support a warrant, a judge may draw
reasonable inferences from the totality of the circumstances.  United
States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007)(although
affidavit did not name crime under investigation, such was inferred from

the facts set forth in affidavit), <u>cert. denied.</u>, 128 S. Ct. 875 (Jan. 7, 2008).

In this case, the search warrant for Faller's residence was supported by probable cause. <u>See</u> <u>United States v. Caswell</u>, 436 F.3d 894, 899 (8th Cir. 2006). In <u>Caswell</u>, the court found that a police officer's affidavit provided probable cause to support the issuance of a search warrant. <u>Id.</u> In that case, the affidavit described information received from a confidential informant, noted that the defendant had been seen buying five boxes of Sudafed, and noted the defendant was found with methamphetamine on his person. <u>Id.</u>

In his affidavit, Trooper Crump detailed similar information. Gov. Ex. 1. In the affidavit, Crump detailed the information he had received from the confidential informant related to Faller's purported possession of pharmaceutical grade pseudoephedrine. Crump also described his encounter with Faller at the residence, and how he had discovered methamphetamine on his person. Because the methamphetamine had been wet, with a strong chemical smell, Crump believed it had been recently produced. Crump also mentioned that he had noticed a burn pile in Faller's yard, with two empty Sudafed brand pseudoephedrine boxes laying on top of the pile. In addition, Crump stated that the burn pile contained a small, rolled-up piece of aluminum foil, that contained a burned residue. Crump stated that small pieces of aluminum foil are commonly used to ingest marijuana, and that pseudoephedrine is the main ingredient used to make methamphetamine. <u>Id.</u>

Looking to <u>Caswell</u>, the supporting affidavit provided the issuing judge a substantial basis for finding probable cause for the issuance of the search warrant.

**4.    Search Warrant Execution**

The particularity requirement serves the goals of the Fourth Amendment by preventing general "rummaging in a person's belongings" and preventing "the seizure of one thing under a warrant describing another." <u>Andreson v. Maryland</u>, 427 U.S. 463, 480 (1976). Whether or not to seize an item is not within the discretion of the officer executing the warrant. <u>Id.</u> A search warrant is adequately worded if

its description of the evidence to be seized is sufficiently definite to enable the searching officers to identify the property authorized to be seized. <u>Summage</u>, 481 F.3d at 1079. How definite or specific a warrant must be will depend on the circumstances of the case and on the type of items involved. <u>Id.</u> The particularity requirement is a standard of practicality rather than technicality. <u>Id.</u> When conducting a search, officers do not need to determine the precise nature of an item on-site. <u>Id.</u> In an effort to preserve an individual's privacy, officers may analyze the nature of relevant materials off-site. <u>Id.</u>

Based on the supporting affidavit, Judge Stewart issued the search warrant. The warrant authorized a search of

> methamphetamine, drug paraphernalia, or precursors, or instrumentalities or fruits of such illegal activities; including ether, tubing, [muriatic] acid, products containing ephedrine, fuel tanks, anhydrous [ammonia] tanks[,] glassware, lithium batteries, salt, filters, scales, records, documents, receipts and proceeds including currency, and all which are related to such illegal activities; and any documents demonstrating proof of the identity of the residences of said premises.

Gov. Ex. 1. The warrant authorized officers to search for these items on Faller's property. <u>Id.</u> Faller's property was defined as "a location known as 2166 Lake Park Trail, Desoto, Missouri; a single-wide mobile home with white, vinyl siding and a white wooden deck attached to the front of the residence. It has several derelict and running automobiles parked on the property, along several outbuildings and lean-tos." <u>Id.</u>

In executing the warrant, the officers searched the burn pile, the mobile home residence, the RV, the shed, the yellow truck, and the red firebird. A search of these areas was authorized by the plain language of the warrant. <u>See</u> <u>United States v. Tamari</u>, 454 F.3d 1259, 1263 (11th Cir. 2006) ("A valid search warrant authorizing the search of vehicles on the subject property permits the search of [any] vehicles [] on that property during the course of the search, so long as the vehicles could reasonably contain items the officers are searching for.").

In searching these areas, the officers seized a number of materials. Seizure of the hand-written notes, with a reference to "dope," was authorized by a search of "documents . . . related to such illegal activities." Seizure of the receipt for the storage unit was

authorized by a search of "receipts."  Seizure of the change purse and
the small purse from the Firebird were authorized by a search of
"methamphetamine" and "receipts and proceeds."[23]  Seizure of the starter
fluid was authorized by a search of "precursors" or "instrumentalities."
See United States v. Gentry, 555 F.3d 659, 661 (8th Cir. 2009) (noting
that starter fluid is associated with the production of
methamphetamine).  Seizure of the pseudoephedrine boxes, fuel tank,
scale, baggies of white powder, and pills were authorized, respectively,
by a search of "products containing ephedrine," "fuel tanks," "scales,"
and "controlled substances particularly identified as methamphetamine."
See Summage, 481 F.3d at 1079 (noting that the officers may analyze off-
site, the nature of relevant materials).  The hand-written notes, the
receipt for the storage unit, the change purse, the small purse, the
starter fluid, the pseudoephedrine boxes, the fuel tank, the scale, the
baggies of white powder, and the pills should not be suppressed.

**Seizure of the Cell Phones**

The officers also seized cell phones from the persons of Faller and
Sutton.  The Fourth Amendment prohibits general rummaging in a person's
belongings, and commands that search warrants "particularly describe[e]
the place to be searched. . . ."  U.S. Const. amend. IV; Andreson, 427
U.S. at 480.  In this case, the search warrant did not authorize a
search of Faller's person.  The search warrant noted that the items to
be seized would be located "on the premises" described.  See United
States v. Young, 263 F. App'x 710, 714 (10th Cir. 2008) (unpublished)
("In both popular and legal usage, the term 'premises' refers to real
property, not persons.").  There is no mention of William Faller in the
text or caption of the search warrant; the warrant does not state that

---

[23]The change purse containing the Sears credit card was found in
the spare bedroom of the mobile home, and not on Hutchings's person,
with no indication of whom it belonged to.  See United States v. Gomez-
Soto, 723 F.2d 649, 654 (9th Cir. 1984) ("It is axiomatic that if a
warrant sufficiently describes the premises to be searched, this will
justify a search of the personal effects therein belonging to the person
occupying the premises if those effects might contain the items
described in the warrant.").

evidence would be found on his person.  The command line of the search warrant authorized a search of the "described premises or property or persons above," but this language is best viewed as boilerplate, particularly since the warrant does not actually describe any person. See id. (hesitating to place too much emphasis on a warrant's boilerplate command line).  The search warrant failed to authorize a search of Faller's person.  Absent any exception to the warrant requirement, the cell phone must be suppressed.

The government argues that any items illegally seized would have been inevitably discovered.  Evidence that has been illegally seized may still be admitted if the government can show (1) "there is a reasonable probability the evidence would have been discovered by lawful means in the absence of any alleged police misconduct," and (2) the police were actively pursuing a substantial, alternative line of investigation at the time of the violation.  United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008).[24]  In this case, the government can make such a showing.

After executing the search warrant, police found several baggies of white powder.  This evidence provided probable cause for Faller's subsequent arrest.  See United States v. Canieso, 470 F.2d 1224, 1228 (2d Cir. 1972) ("When an experienced narcotics agent has seen a quantity of bags containing white powder in the possession of the suspects, little, if anything, more is needed to show probable cause.").  Having arrested Faller, officers would have been entitled to conduct a search of his person.  Chimel v. California, 395 U.S. 752, 763 (1969).  During such a search, officers have the authority to seize any weapons and any evidence of the offense.  Id.; see also United States v. Robinson, 414 U.S. 218, 236 (1973) (During a search incident to arrest, the officer was entitled to seize any "fruits, instrumentalities, or contraband probative of criminal conduct.").  The search of Faller would have yielded his cell phone.  Since cell phones are known tools or

---

[24]In Thomas, Judge Colloton argued that the first prong of the inevitable discovery doctrine was overinclusive, the second prong was underinclusive, and urged the full court to reconsider its previous standard.  Thomas, 524 F.3d at 860 (Colloton, J., concurring).  A subsequent panel has applied part of Judge Colloton's proposed standard. United States v. Johnson, 528 F.3d 575, 580 (8th Cir. 2008).

instruments of the drug trade, the officers would have had the authority to immediately seize the phone. See <u>United States v. Portalla</u>, 496 F.3d 23, 27 (1st Cir. 2007) (noting that cell phones are essential tools of the drug trade); <u>United States v. Finley</u>, 477 F.3d 250, 260 (5th Cir. 2007) (holding that officers could seize cell phone and search its call records and messages incident to a lawful methamphetamine-related arrest). Applying the more stringent standard in <u>Thomas</u>, it is more likely than not that the officers would have discovered and seized Faller's cell phone by lawful means pursuant to an alternative line of investigation. Faller's cell phone should not be suppressed.

Police also seized a cell phone from Sutton's person. Fourth Amendment rights are personal, "and cannot be asserted vicariously." <u>United States v. Perry</u>, 548 F.3d 688, 691 (8th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 2174 (May 4, 2009). Because Faller and Hutchings cannot show that they had any reasonable expectation of privacy in Sutton's belongings, they lack standing to challenge the seizure of the cell phone from Sutton's person. See <u>id.</u> at 692. Sutton's cell phone should not be suppressed.

**5.  Search of the Storage Unit**

As noted above, voluntary consent provides a notable exception to the warrant and probable cause requirements of the Fourth Amendment. <u>Sanders</u>, 424 F.3d at 773. A search is legal if the subject of the search gives her consent, and that consent is knowing and voluntary. <u>Id.</u> The question of voluntariness requires a review of all the facts, including the characteristics of the accused and the details of the interrogation, and examines whether consent was given without any form of police coercion. <u>Id.</u>; <u>Fleck</u>, 413 F.3d at 891-92. It does not, however, require any specific custodial status.

The custodial status of the consenting party "is not determinative of voluntariness." <u>Fleck</u>, 413 F.3d at 892; <u>see also</u> <u>United States v. Hinton</u>, No. 1:09 CR 58 SNLJ, 2009 WL 2928313, at *11 (E.D. Mo. Sept. 9, 2009) ("<u>Miranda</u> warnings are not required for the validity of a consent to search, though their administration could be a factor to be reviewed

by a court in considering whether the consent was actually voluntary."). As long as consent is voluntary, a <u>Miranda</u> violation does not require the suppression of derivative physical evidence. <u>United States v. Villalba-Alvarado</u>, 345 F.3d 1007, 1008 (8th Cir. 2003). The reason behind the rule is simple: statements of consent are not testimonial within the meaning of the Fifth Amendment. <u>United States v. Stevens</u>, 487 F.3d 232, 243 (5th Cir. 2007). Consent statements, therefore, must be viewed within the context of the Fourth Amendment. <u>Id.</u> at 242.

In executing the search warrant, officers discovered a receipt for a storage unit. At the end of the two-hour search, officers asked Hutchings about the contents of the storage unit. She stated there was nothing illegal in the unit, gave the officers the key to the unit, and consented to a search of the unit. When officers searched the storage unit, they seized six items, including another 40 to 50 pills. During the search, Hutchings was inside the police car, but never told the officers to stop searching. The government argues that Hutchings was not in custody when she consented to the search, but concedes that she was in custody after police drove her to the storage facility. (Doc. 48 at 2-3.)

Looking to the totality of the circumstances, Hutchings's consent to search was voluntary. While waiting for Crump to return, Hutchings was detained on the property, but allowed to walk around outside. When the officers approached her for consent, there is no evidence she was subject to lengthy questioning. There is no evidence the officers threatened or intimidated her, or that she relied on promises or misrepresentations. She was not under arrest, and was not located in a secluded place. She was 29 years old, and there is no evidence she was intoxicated or otherwise impaired at the time. When officers ultimately searched the storage unit, she did not object to the search. <u>See</u> <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990) (listing factors to consider when determining voluntariness). Because Hutchings's consent to search was voluntarily given, the search of the storage unit and the seizure of its contents did not violate the Fourth Amendment. The items found in the storage unit should not be suppressed.

**6.   Search of the Purse**

The scope of a search is defined by its expressed object.  <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  <u>Id.</u>  The stated object of the search also determines which containers an officer may inspect without exceeding the scope of a consent to search.  <u>Id.</u> at 249.  In other words, it is objectively reasonable for a police officer to believe that consent to search a specific area authorizes that officer to open any closed container found within that area, that might reasonably hold the object of the search.  <u>Id.</u>

Hutchings provided unqualified consent to search the storage unit. She also offered to sit down with officers and provide them with further information.  During the search of the storage unit, she did not voice any objections to the scope of the search.  Finally, a reasonable person would have understood that the search of the storage unit related to a search for drugs - items that may be found within small containers or purses.  Under <u>Jimeno</u>, Hutchings's consent to search the storage unit provided consent to search her purse, found within the storage unit. The pills found in Hutchings's purse should not be suppressed.  <u>See United States v. Gallardo</u>, 495 F.3d 982, 990 (8th Cir. 2007) ("We have held that the typical reasonable person would understand a suspect's general consent to search a vehicle for drugs to include consent to open unlocked containers within the vehicle, access apparently false compartments, and search any part of the truck where drugs might be stored.") (internal citations omitted).

<u>**Events of June 23, 2009**</u>

**7.   Glass Vial**

As noted above, officers are entitled to conduct a search of a suspect that has been arrested.  <u>Chimel</u>, 395 U.S. at 763.  During a

search incident to arrest, officers have the authority to seize any weapons and any evidence of the offense. <u>Robinson</u>, 414 U.S. at 236; <u>Id.</u>

On June 23, 2009, officers arrested Faller pursuant to an arrest warrant. Following his arrest, a trooper searched Faller and discovered a glass vial in his pocket, which tested positive for methamphetamine. The glass vial was found by a search incident to arrest, and was evidence of the offense. The vial should not be suppressed.

## 8. Search of the Property

As noted above, voluntary consent provides an exception to the warrant and probable cause requirements of the Fourth Amendment. <u>Sanders</u>, 424 F.3d at 773. A warrantless search is legal if the subject of the search gives his consent, and that consent is knowing and voluntary. <u>Id.</u> The question of voluntariness requires a review of all the facts, including the characteristics of the accused and the details of the interrogation, and examines whether consent was given without any form of police coercion. <u>Id.</u>; <u>Fleck</u>, 413 F.3d at 891-92. The custodial status of the consenting party "is not determinative of voluntariness." <u>Fleck</u>, 413 F.3d at 892.

After arresting Faller, Sgt. Reed asked him if he would consent to a search of the property. Faller responded, "I don't give a fuck what you do." This statement constituted consent to search. <u>See</u> <u>United States v. Baker</u>, 78 F.3d 1241, 1244 (7th Cir. 1996) (finding statement "'I don't care - you can if you want to,'" provided clear and unequivocal permission to search defendant's vehicle).

Faller offered this consent voluntarily. At the time, Faller was under arrest, but the officers had read him his <u>Miranda</u> rights. In addition, there is no evidence Faller was impaired. He did not appear to be under the influence of drugs, he understood what was going on, and his responses to the officer's statements were appropriate, though his demeanor was indifferent. Finally, Faller was fully aware of his right to refuse consent; during the September 2008 encounter with police, he had refused to allow police to search his property. <u>See</u> <u>Sanders</u>, 424 F.3d at 773. Looking to the totality of circumstances, Faller's consent to search his property was voluntary.

After receiving consent, officers searched Faller's mobile home and found evidence related to the production of methamphetamine. These items were found pursuant to a consent search and should not be suppressed.

**9.  Search of the Truck**

Exigent circumstances, when paired with probable cause, provides another exception to the warrant requirement of the Fourth Amendment. Kleinholz v. United States, 339 F.3d 674, 676 (8th Cir. 2003) (per curiam).  "In certain narrow situations, therefore, exigency may be substituted for a warrant, but probable cause must be present before either a warrant or exigency will allow a search." Id.  The production of methamphetamine, which requires dealing with highly caustic and combustible chemicals, can create exigent circumstances. See id; United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002) ("The potential hazards of methamphetamine manufacture are well documented. . . .").

After arresting Faller, officers found a glass vial in his pocket that tested positive for methamphetamine.  When they searched his mobile home, the officers found several items that appeared to be related to the production of methamphetamine.  Officers therefore had probable cause to believe that evidence of the production of methamphetamine would be found elsewhere on the property.  Indeed, a few months earlier, officers had discovered starter fluid, pseudoephedrine boxes, a fuel tank, a scale, baggies of white powder, and pills during a search of Faller's property.

Supported by probable cause, officers found and seized Coleman fuel, acetone, and ether from a truck on the property.  These materials are all components of methamphetamine production and extremely hazardous.  See United States v. Chamness, 435 F.3d 724, 727 (7th Cir. 2006) ("Coleman fuel is flammable and can be explosive."); United States v. Galbraith, 200 F.3d 1006, 1009 (7th Cir. 2000) (noting that Coleman fuel and ether are used to produce methamphetamine).  Looking to Walsh and Kleinholz, exigent circumstances justified the seizure of the Coleman fuel, acetone, and ether from the truck.  These items should not be suppressed.

## B.  Fifth Amendment Issues

The Fifth Amendment to the Constitution protects an individual from being "compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V.  To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent and that any statement he makes may be used against him.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  In <u>Miranda</u>, the Supreme Court concluded that the inherently coercive nature of custodial interrogations blurred the line between voluntary and involuntary statements, heightening the risk that an individual would be deprived of the Fifth Amendment's protections.  <u>Dickerson v. United States</u>, 530 U.S. 428, 435 (2000).  The procedural safeguards prescribed by <u>Miranda</u> only apply to persons who are subjected to interrogation and who are in custody.  <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494-95 (1977) (per curiam).  The simple fact that an investigation has focused on a particular suspect does not implicate <u>Miranda</u> if the settings are noncustodial.  <u>Minnesota v. Murphy</u>, 465 U.S. 420, 431 (1984).

### Events of September 25, 2008

**1.  Faller's Statements about the PVC Tubes**

While officers were executing the search warrant, Trooper Sitton asked Faller whether he had any drug money buried in PVC tubes.  The government has conceded that Faller was in custody at the time, that the question was intended to illicit an incriminating response, and that Faller had not received any <u>Miranda</u> warnings.  (Doc. 48 at 3.)  Under <u>Miranda</u>, Faller's responses to the question about the PVC tubes should be suppressed.

**2.  Hutchings's Statements about the Storage Unit**

An individual is in custody if she has been formally arrested or if her freedom of movement has been restricted to a degree associated with a formal arrest.  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)

(per curiam).  In determining the question of custody, the court first looks to the circumstances surrounding the interrogation.  <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  Given those circumstances, the court then asks whether a reasonable person would have felt at liberty to terminate the interrogation and leave.  <u>Id.</u>  The critical inquiry centers on whether the person's freedom to depart was restricted in any way.  <u>Mathiason</u>, 429 U.S. at 495; <u>United States v. LeBrun</u>, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  In making this inquiry, the court looks to the totality of the circumstances from an objective viewpoint, and not the subjective views of either the suspect or the officers.  <u>Stansbury v. California</u>, 511 U.S. 318, 322-23 (1994) (per curiam); <u>LeBrun</u>, 363 F.3d at 720.

After executing the search warrant, Trooper Crump approached Hutchings and asked her whether there was anything in the storage unit. Hutchings responded that there was nothing illegal in the storage unit. Trooper Crump then asked whether she would consent to a search of the unit, and Hutchings replied that the police could search it and that she would accompany them.  At the time, Hutchings had not received any <u>Miranda</u> warnings.  However, if she was not in custody at the time, there was no <u>Miranda</u> violation.

Looking to the totality of the circumstances, Hutchings was not in custody when she answered Trooper Crump's question.  On the one hand, Hutchings did not initiate this encounter.  The officers approached her to ask about the storage unit, and did not inform her she was free to leave.  On the other hand, Hutchings was not restrained during the brief period of questioning, and officers did not employ any strong-arm tactics during the questioning.  After she answered the questions, Hutchings was not placed in handcuffs or formerly arrested.  This held true even as she volunteered to ride in the patrol car when she accompanied the officers to the storage unit.  Under the circumstances, Hutchings was not in custody.  <u>See</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990) (listing factors to consider in conducting custody analysis).  Looking to <u>Mathiason</u>, the officers were not required to advise her of her <u>Miranda</u> rights, and her statement that there was nothing illegal in the storage unit should not suppressed.

As noted above, her statements of consent do not implicate the Fifth Amendment, and therefore should also not be suppressed. <u>Stevens</u>, 487 F.3d at 243.

### 3. Hutchings's Statements about her pills

For <u>Miranda</u> purposes, "interrogation" encompasses more than simply express questioning. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980). It includes any words <u>or actions</u> by police that "the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301. This standard primarily focuses on the perceptions of the suspect. <u>Id.</u>

When the officers conducted the search of the storage unit, they discovered a purse with a prescription bottle containing Hydrocodone and Xanax pills. After finding the bottle, the officers brought Hutchings from the police car, and showed her the bottle. In response, she stated that she had the pills from when she had been seeing a doctor.

The government concedes that Hutchings had not received <u>Miranda</u> warnings and was in custody when officers asked her to identify items inside the storage locker. (Doc. 48 at 3.) Looking to <u>Innis</u>, the act of taking Hutchings from the police car and showing her the pill bottle was intended to illicit an incriminating response. Taken together, Hutchings's statement about the pills should be suppressed.

### 4. Hutchings's Statements at the County Jail

Statements made after a knowing and voluntary waiver of Miranda rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. <u>United States v. Briones</u>, 390 F.3d 610, 614 (8th Cir. 2004).

When the officers took Hutchings to the Jefferson County jail, she agreed to cooperate. To that end, Investigator Tatamble provided Hutchings with an Advice of Rights form. Hutchings read the form, signed it, and told Tatamble she understood it. By signing the Advice of Rights form, Hutchings waived her <u>Miranda</u> rights. <u>See</u> <u>North Carolina</u>

v. Butler, 441 U.S. 369, 372-76 (1979).  After waiving her rights, she made oral statements.

Before making these statements, and while she was making these statements, the police did not subject Hutchings to any duress or coercion.  The officers did not draw their weapons or make any threats to induce her cooperation.  Her statements were made voluntarily and responsively, and were not induced by any improper government action. See LeBrun, 363 F.3d at 724.  Accordingly, any statements Hutchings made in the County Jail should not be suppressed.

## Events of June 23, 2009

**5.  Faller's Statement about Drugs in the House**

As noted above, statements are admissible if they follow a knowing and voluntary waiver of Miranda rights.  Briones, 390 F.3d at 614.

When the officers arrested Faller at his residence, they orally advised him of his constitutional rights to remain silent and to counsel.  Faller stated that he understood these rights.  After reading him his rights, Trooper Sitton asked Faller whether he had any other drugs in the house.  Faller answered No.  This answer constituted a waiver of his rights.  See Butler, 441 U.S. at 372-76.  Before answering the question, and at the time he answered, Faller was not the subject of any duress or coercion.  The officers did not draw their weapons or make any threats to induce his cooperation.  His statement was voluntary and responsive, and was not induced by any improper government action. See LeBrun, 363 F.3d at 724.  Faller's statement that there were no drugs in the house should not be suppressed.

**6.  Faller's Statements about Buried Money**

The passage of time does not compromise Miranda warnings.  United States v. Frankson, 83 F.3d 79, 83 (4th Cir. 1996).  "Courts have consistently upheld the integrity of Miranda warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation."  Id. (admitting statements made two and a half hours after Miranda warnings issued).

During the drive back to St. Louis, Faller volunteered that he was sick of people asking him about items buried on his property. See also United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005) ("Voluntary statements that are not in response to interrogation are admissible with or without the giving of Miranda warnings."). Agent Magel asked Faller what he was talking about, and Faller made a statement about his casino winnings. Agent Magel asked another question, and Faller responded that he had not paid taxes on the winnings, and had spent the money on vehicles. These statements were a continuing waiver of Faller's Miranda rights, and there is no evidence these statements were the product of police duress or coercion. These statements were voluntary and responsive, and should not be suppressed.

## RECOMMENDATION

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the motions of William A. Faller to suppress evidence and statements be granted in part, and otherwise denied. (Docs. 17, 31.) Only Faller's responses to the question about the PVC tubes should be suppressed (Finding No. 22). No physical evidence should be suppressed.

**IT IS FURTHER RECOMMENDED** that the motions of Brandi M. Hutchings to suppress evidence and statements be granted in part, and otherwise denied. (Docs. 20, 32.) Only Hutchings's statements about the pills taken from her purse should be suppressed (Finding No. 26 n. 21). No physical evidence should be suppressed.

**IT IS FURTHER RECOMMENDED** that the motions of the government for the admissibility of evidence be denied as moot. (Docs. 18, 21, 28.)

The parties are advised they have until December 30, 2009, to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections could result in the waiver of the right to appeal issues of fact.

_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 14, 2009.